United States v. Samora and this is 19-407-0. May it please the court, counsel for the United States, Jessica Stengel on behalf of Mr. Samora. You mind if I hold the microphone? Absolutely. We raised two arguments in our briefing. The erroneous jury instruction and insufficient evidence.  Counsel, is there really any argument from both sides about the jury instruction or the trial court substituting evidently his own instruction for a correct instruction? Both parties agree that the instruction is plainly erroneous. Based on my reading of the government's briefing, they take issue with prongs three and four of plain error. As they believe that... This is an element in a jury instruction. It is, and as this court recently recognized in Giannoukis, in light of the revered status of a beyond a reasonable doubt standard, in this court's criminal jurisprudence, a jury instruction that allows a conviction where one important element may not have been found against the defendant by such a standard cannot be overlooked. Well, we'll let the government argue his plain error argument in regards to that, but I just wasn't sure there was really any argument about that. So, go ahead. I'm sorry, counsel. Ms. Stengel, when you're speaking, you have to keep speaking into the microphone because it fades in and out. I apologize. I don't want to... There's no reason to apologize. So, we believe there is no argument. The government's evidence at trial was far from overwhelming. Quite frankly, it was underwhelming. And but for the erroneous jury instruction, a jury would not be compelled to find Mr. Samora guilty. Rather, they would almost be compelled to return an acquittal. What about on actual possession? There was no jury instruction error there, was there? The court, the instruction that the court gave combined actual and constructive into one singular possession. But that portion of that instruction that talked about actual possession was correct. Yes, Your Honor. This is not an actual possession case. The government offered no evidence that put the gun in Mr. Samora's hand at any point in time. The best evidence... Wasn't the DNA evidence an indication that it had been in his hand and he had the predominant DNA signature on the gun? No, Your Honor, actually. The DNA evidence from the gun showed that at some point in time prior to Mr. Samora being arrested, he was in the same space as the gun. It does not put the gun in his hand. And quite frankly, the evidence that... You thought the DNA was retrieved from the trigger and the handle? It was retrieved from the handle, absolutely. Well, the point being that there was DNA, his DNA was on the gun. Sure. And that was not disputed at trial. And he was a major contributor of multiple DNA on that gun. I think there are several misstatements within that. He was... The government's expert found 10 nanograms of DNA on the gun. Half of that, 5.4 nanograms, were from a man. At least one male, maybe more. The government expert could not say. And from that 5.4 nanograms, the expert was able to determine that Mr. Samora was the major profile. She couldn't say how much of it was or how much of other men had contributed to that sample. Now, the government also offered evidence of a swab taken directly from Mr. Samora. So the jury knew what DNA would look like had it come from Mr. Samora, had Mr. Samora held that gun at any point in time near the date of the indictment. Was any of the DNA evidence indicating that it was left by a woman? It was inconclusive, Your Honor. The DNA... What the government's expert testified to was that there were 10 nanograms of degraded DNA on the gun. At least three people contributed to that DNA sample. Half of that, the DNA expert was able to identify as male. How do you respond to your adversary's emphasis on the government's expert's testimony that this could not have been secondary transfer and uses the example of an experiment where two people shook hands over a prolonged period of time, and even that was not enough to result in 10 nanograms of DNA? You're right. In the handshake experiment, the DNA expert testified to resulted in 5 nanograms of DNA. And we know that there was a total of 5 nanograms from men on the gun, but that all was not attributable to Mr. Samora, and there was no dispute at that. I'm totally surprised, honestly, because I thought your argument, and I just want you to tell me if I did misunderstand, because apparently I did, I thought you never questioned whether or not there was sufficient evidence, and maybe even strong evidence, that Mr. Samora had handled Ms. Fernandez's gun. I thought your argument about degradation in the 3.53 DNA rating was that it deteriorated, degraded over the passage of time, so that it was unlikely that Mr. Samora had handled the gun on or about May 26, 2017. I didn't know that you were actually questioning whether he had ever handled the gun. We did, Your Honor, and the second part is absolutely correct. There was no way to tie Mr. Samora to the gun via DNA at a point in time near the date in the indictment. But, and it's maybe not secondary transfer, but there is not enough evidence to say that Mr. Samora definitively had the gun in his hand. As the government's expert testified, he could have spit on it, he could have sneezed on it, he could have had a bloody nose all over him. And she did say he could have done that, but the chances are about 1 in 10 billion. No, that was... Well, that it was secondary transfer. That it was secondary transfer, which is something entirely different than being in the same space and sneezing all over it, such as this timer. I'm not holding the timer, but I could sneeze all over it and my DNA would be there. Mr. Samora could have been looking at the gun in somebody else's hand and sneezed on it. And we have no way of knowing that. We cannot put it in his hands. That's an inference without any support in the record. What if we conclude that we just disagree with you on... and that there was strong evidence of actual possession, and we find in your favor on prongs three and four on the constructive possession theory? Do we affirm or reverse? They say that we can affirm on alternative grounds based on actual possession. Sure, and I would say you need to reverse because the jury verdict is not clear. And failing to instruct a jury on an essential element of the crime violates the Sixth Amendment jury trial guarantee. Is that so in a plain air case? I don't want to ask you about a case that was not cited, but there is a case that suggests that in plain air, the fact that there may be an element error does not mean that it's reversible. In order for that to be the case, it needs to be clear from the jury verdict on what the jury was relying, and the government's evidence must be overwhelming. And neither is the case in this instance. Moreover, this court applies plain error less rigidly when correcting a constitutional error such as failing to instruct on an essential element of the crime. I think I will reserve the remainder of my time. You can reserve, but I've got one more. Am I correct in that you're saying that the evidence does not show that your client handled the gun? That the DNA that came from the gun was not your client's? No, Your Honor. The DNA from the gun, the major profile, an amount that we cannot quantify. Where did we then, because I read the same thing, that he was a major contributor to that. Where does that come from? It's not a major contributor, and this is a fundamental issue with language. It was the major profile. Okay, so the word is a major profile, which means what? It means that out of this 10 nanogram sample of degraded DNA, half of it was male, and then out of that half, out of those 5 nanograms, the DNA expert was able to determine that Mr. Samora contributed some DNA to the gun. That's evidence then that we have in this record, right? It is, but it is not evidence that puts the gun in his hand. Based on the conviction, doesn't that suggest that the jury credited the DNA testimony from the prosecution? It's not clear, Your Honor. It's a general verdict that he simply possessed the weapon while being a prohibited person. Well, let me ask you this. Is there sufficient evidence here absent the DNA? No, Your Honor. It doesn't even rise to the level. Then doesn't that necessarily mean that the jury credited the DNA testimony? Your Honor, it is impossible to determine, and I would say based on the record evidence, the jury was more persuaded by the idea that some DNA got on the gun somehow, and that was enough to convict Mr. Samora, and that's not what this crime requires. There's a much greater specificity in terms of both the mens rea and what the government needs to prove, and whether the jury disbelieved that Ms. Hernandez put the gun in the car, whether the jury disbelieved any evidence that... On the sufficiency of the evidence question, don't we... and a judgment from the... a verdict from the jury, don't we review that in the light most favorable to the government? We do under the law of the... in the circuit at the time of trial. There was no evidence adduced by the government going to intent. Okay. And with that, I will reserve the remainder of my time. Good morning, Your Honors. May it please the Court. I'm Ryan Tinney, and I'm here on behalf of the United States. Before I get into the particulars of the DNA evidence and the actual versus constructive components of this case, I'd like to start on the macro level that Ms. Stangle started on, which is what evidence linked Mr. Samora to this gun. As I understand it, Mr. Samora had a gun. As I review the record, he was linked to this gun at trial on six different levels. Number one, his DNA was found on the handle of the gun in sufficient quantity for the DNA experts to label him the major contributor. Number two, he was alone in the car with the gun for several hours before it was discovered. Number three, while he was alone in the car with the gun, he was in close proximity to it. It was mere inches away from his right hand. Number four, while he was alone in the car... What was number three? Number three is that while he was alone in the car, he's in close proximity to the gun itself. It's found in the console, just inches away from where his right hand would have been. Number four, while it's in the car, it's nearby his wallet and cash. Well, in the sense that everything in a vehicle is near everything else. I mean, the close console, like most cars, is in the middle, equidistant from either door, and his wallet is down here on the side. So, I mean, it's close in the sense that everything... I guess, except... Sure, except everything... I'm sorry. Everything is not in the same distance. Something in the back seat is different than... Same side. Right, but if you imagine a driver sitting in the driver's seat, and he needs to put his wallet somewhere, and he needs to put his gun somewhere, his gun is inches away from his right hand, with the way that this car is set up, and his wallet and cash are inches away from his left hand. It's at least some circumstantial evidence. Number five, he flees from police, even goes so far as to fight... What was five? Five, he flees from police, even goes so far as to fight... I still didn't understand you. What was number five? He flees from police. He runs away from police. Okay. Even going so far as to fight and struggle with them when he's apprehended. And so if the question before you, to start where Ms. Stengel started is... Well, let's pick apart more of your five things. It seems to me most reasonable to think that he fled because there was an outstanding warrant and he didn't want to be arrested and didn't necessarily have anything to do with the gun. In our view, they're equally reasonable. I think you could draw the inference that he ran because of the warrant, but I think you could also draw the inference that he ran because he knew he was a felon and he had a gun inside the car he'd been driving. I don't know that one would be more or less reasonable. I mean, to be clear, we're not relying on that as the principal piece of evidence. There's a reason it's a number. There was an inventory of the contents of the car, correct? Yes. And when they take those inventories, do they distinguish the location of various items in the car? What we have in this record is a police report indicating what was found where. It didn't indicate what else was found in the glove box? I don't recall there being anything. Cigarette. Center console. There was the cigarettes found in the center console. She claims it was her cigarettes, yes. The only testimony as to who owned the cigarettes was Mr. Hernandez's testimony. That's correct. We're not relying on the cigarettes, obviously, as the principal piece of evidence. I mean, in our view, then coming to the more specific piece, I think the DNA is the strongest evidence, and quite frankly I think the DNA is the evidence that distinguishes this case from other cases in which you've reversed. Did your expert talk about what major contributor or major profile? Which is the correct term? Which term did your expert use? I believe she used the phrase major profile. Okay. Did the expert further testify as to what that meant in a vacuum and also in relation to the other profiles, DNA profiles on the gun? Yes to both. On pages 178 to 179 of the record, she says that this is the major profile, and she says that it means, quote, that it contributed more DNA than others. She then puts up a graph. She's questioned about a graph. She says that there's, quote, a disparity. This is page 172. A disparity between his DNA profile and the other DNA that was found on the gun. She doesn't go in. This was one of the questions asked earlier. She didn't have samples to compare the other DNA strands, the other DNA profiles, so we don't know who the other people are. But what we do know is that his DNA profile is what she refers to as the major DNA profile, meaning he left more than anyone else. And where was his DNA found on the gun? On the handle and the trigger area. There's specific testimony to that. Did she testify where the DNA from the others was found on the gun? I don't recall there being testimony about that, no. But we know that his DNA was collected from the handle. Did she testify at all about timing, and that is, is it more likely that the predominant profile was the last person to leave DNA? No, the DNA expert does not get into that, no. The DNA expert did say that it was a degradation factor of 3.53, and anything over 2 is an indicator of degradation, right? Yeah. She says that this is. . . And one of the three reasons that she gives for the reason for degradation is the passage of time. That's correct. And so let me back up a little bit. You have an argument that we should affirm on alternative grounds that we hear frequently, but I don't know personally, that I've confronted this situation where you have an admitted instructional error. And so let's say we say, unequivocally, there is sufficient evidence on which a jury could find actual possession. Now, with that, would you argue that we can affirm on alternative grounds? Yes. Well, how do you reconcile that with Sorenson, which said that there has to be. . . There was strong evidence. . . I hate to do this, but another case that wasn't cited, 1986, the opinion of Judge Holloway, United States v. Laranaga. If you have sufficient evidence of one theory, and you have a conceded error on an instructional error with the presumption that it affected the defendant's substantial rights, and we have a general verdict, how do we know what the jury relied on? That's Stromberg, that's Yates, and these were cited, where there's absolute uncertainty. And so Yates and Stromberg and Griffith, they all require us to reverse. You don't know, but that's the reason that you affirm, and let me explain why. Aeon Corrales, which we did cite in our brief, uses the following language. It says if the alternative ground on which the jury was instructed has sufficient evidence, then you can affirm. And if you step back and you think about it jurisprudentially. . . Well, those are two theories, I think, in your brief, where you have challenges with insufficiency of evidence on two distinct theories. You haven't cited a case, and if you have, tell me, because I looked and I didn't find one, where you can affirm on alternative grounds because there was sufficient evidence on one theory and an instructional error on the other. I'm not aware of a case that's in that precise posture, but I think that the rule from Aeon Corrales applies naturally. And the reason why it applies naturally is because it fits comfortably with what you ordinarily do on a sufficiency review. On a sufficiency review, if a theory was presented to the jury in the jury instructions, you then draw all reasonable inferences in support of the verdict, and that's the Hornbuck language. You look at the evidence yourselves, and if there's evidence in the record from which the jury could reasonably find the elements, then you stop. So here, if you have two theories that are equally presented to the jury, and we can get into that, but our view is they were, and the defendant has only chosen to challenge one of those theories on appeal, that doesn't tie your hands. It doesn't prevent you from doing what you ordinarily do, which is look at the evidence in the light most favorable to the verdict and say, did the evidence presented to that trial reasonably support conviction on this theory that was actually presented to the jury? Let me ask you this, Mr. Tiddy. So let's say we agree completely with what you just said. So part of your argument presumes that at prong three on the constructive possession theory that we have already found that the error in the instruction has affected Mr. Samora's substantial rights, correct? So you're saying that even in the development, there's no error. No. I mean, we don't have the Yates issue if we should reject the defendant's claim on constructive possession at prong three of plain error. Perhaps I'm misunderstanding your question, but here's how I understand the response to that question to be. We're conceding effectively prongs one and two. We're conceding that there was obvious error. We're not conceding that it affected his substantial rights in prong three. I know that. But let's just say – well, let me ask it a different way. Hypothetically, we say at prong three of plain error on the constructive position theory that we say that the error in the instruction has affected the defendant's substantial rights. Are you still saying that even if we find for the defendant on plain – at prong three and let's say prong four of plain error that just because there was sufficient evidence of a different theory, actual possession, that we still should affirm even though we have already found that the instructional error has affected the defendant's substantial rights and has seriously affected the fairness, integrity, and reputation of the judicial proceedings? Yes, and here's why. And I'm going to quibble a little bit with the premise of your question, and I think it's the answer to it. Under prong three, the standard plain error question is, is there a reasonable probability that this particular error mattered essentially, but for this error this would have come out the same way? What we're saying is if there is obvious error with respect to the instruction on one alternative, but there is strong or overwhelming – pick your adjective or adverb – if there is strong or overwhelming evidence of the other theory for which there was no instructional error, then it's not the case under prong three that there is a reasonable probability that the error actually affected the verdict because there was strong or overwhelming evidence of the other alternative. Well, you just shifted your argument because that's Soren's. It has to be – in other words, do you agree that based on what you just said, there has to be strong or overwhelming evidence on the valid theory in order for us to affirm an alternative ground? Yeah, well, we agree holistically. I don't think that you've created a plain error-specific rubric for this particular kind of problem. I think you analyzed this under ordinary plain error principles, which is, is there a reasonable probability that this particular error affected the outcome? And so if you imagine – I'm going to construct my own hypothetical, Your Honor – if you imagine a case in which it wasn't just overwhelming, but it was the strongest evidence that you could possibly imagine of actual possession. The guy's on video, nine different people look at him, he's holding the gun. No reasonable juror could have found anything but that he actually possessed it. If there is instructional error on the constructive possession, it wouldn't make sense jurisprudentially to reverse that conviction. But your problem – and I understand your answer. You're saying these are two independent prongs, and that even if we find all four parts of plain error on constructive error, on constructive possession, that does not address the question on actual possession. That's your position, right? Yeah, our position is that – Don't you agree that this is not overwhelming evidence? You know what, we think this is overwhelming evidence. I'm not aware of a single case that you've confronted in this area of law in which a defendant's DNA and or fingerprints, but really his DNA, was all over an item in question that he'd been left alone with in a closed space, and in which the court looked at it and said, well, that's not evidence of possession. The only evidence – let me put it this way. We're not talking about – clearly it's evidence. Clearly it's evidence. The question is, is it overwhelming evidence? It is overwhelming evidence because it's been something of a shifting target, I think, in the defense theory of this case, what their argument is. But here's what we have. We have a DNA expert who got on the stand and testified that his DNA – he is the major DNA contributor to the DNA that's found on the handle of this gun. There is no contrary testimony from any expert. In your consideration of overwhelming evidence, do you consider at all the testimony of Ms. Hernandez? We've relied on her for the timing purposes because she establishes the timing of when he's alone with the gun. But in terms of him – Well, but what about the proposition that she had the gun to protect herself in her house, and yet the gun was in the car? Right. I mean, I think there's one of two ways to look at it. In either way, he's convicted. Way number one is she's just lying wholesale and it's the defendant's gun, in which case he possessed it. Or way number two is you accept her testimony at face value, in which case she gives very specific timing testimony. She says she put the gun in the car a couple of days earlier, and that the first time he's in the car after that is that day. So either way, he's possessing it that day. But let me come back to the quantum of evidence DNA stuff. The testimony below from the DNA expert was essentially uncontradicted about the following points. One, his DNA was on the handle of the gun. Two, more of his DNA was on that gun than from any other person who handled the gun. And three, she says it's, quote, unlikely that his DNA would have gotten on the gun in that quantity through some sort of secondary transfer. No expert says otherwise. How much time passed from the time he was apprehended until the DNA testing was done? I've got that in my notes. It was a couple of weeks later. So degradation, some degradation occurred in that two-week lapse. She does. It does. But then here's the response to that, Your Honor. The DNA. Wait a minute. Oh, I'm sorry. That's supposed to help you. No, no. Because the degradation I'm asking about was after he was arrested. Correct. That degradation. Right. I mean, the degradation issue, the defendant is trying to sort of look at a big picture and say, well, because the DNA is degraded, it can't be relied on. And I think that's what I'm responding to. I don't know that that's what their argument is. I thought that the argument, I mean, she's got rebuttal time, so she gets to try, is that the degradation shows that there is no way to know whether or not he handled the gun on or about May 26, 2007. That's the question I've been trying, because the indictment clearly says it was on that day. Right. Nothing to the jury that shows that on that day that he actually possessed that gun. So how can that be overwhelming evidence? It's overwhelming because the only timing, I'm out of time. That's all right. I want you to answer. Right. The only timing evidence that was in front of the jury was timing evidence from Maria Hernandez. It's in your indictment, young man. Right. And this, I think, is the answer to your question, Judge Baldock. The only testimony below from any witness about the timing of the defendant vis-à-vis the gun is the testimony from Maria Hernandez, and the only timeline she gives is a timeline in which he's alone in the car with the gun that day. There's no other timeline that's presented to the jury from any other witness. And so if the indictment says it's got to be on May 26th, and Maria Hernandez says, without contradiction from anybody, that she puts the gun in the car a couple of days earlier, that's the quote, and that he borrows the car, quote, earlier that day. And he had borrowed it a couple of months earlier, and he borrowed the car regularly. He did. But I think at that point you end up with one of two scenarios, both of which lead to conviction. Number one, if the jury accepted her timeline evidence, which again was the only timeline evidence, then he's got it that day. That's actual possession. But even if he doesn't actually possess it that day, if he possessed it some other day. And had put his DNA on it and handled it two months earlier. Sure. Then you get under the Benford rubric. What Benford says is evidence that the defendant handled the gun at some other time can be used as circumstantial evidence of intent. And so to use this. Except Judge Volokh knows this better than anybody. He did. They reversed on constructive possession in Benford. They did. But the evidence is stronger here than it was in Benford. Because in that scenario, it was a jointly occupied bedroom alongside his wife's purse, which was a point that you emphasized in your opinion. Here we have a guy who's alone in a car for several hours with the gun. And so we don't have that evidentiary problem. So even if, to make my point clear, if he possesses it that day, if you believe Marie Hernandez, it's actual possession on that day. If he handled it some other day, which nobody says. But if he did handle it some other day, then what you do is you say we constructively possessed it that day. Why? Because he had power and intent and knowledge that day. And how do we know that? He's alone in the car. It's inches from his hand. We know he handled it some other day. This is the Benford language. And so forth. He ran from the police. And then you get there. So you can get there either way. Thank you. One question. It has nothing to do with helping us decide this case. Are you aware that there is another case from Utah that was argued last term? I can't remember the name of the case. Cortez, the same error occurred. And that is that there was no element of intent in constructive possession. That there was neither an objection from the defense attorney nor a correction by the U.S. Attorney's Office. Are you aware that this has occurred before in Utah? I'm aware of that case vaguely. I didn't work on it. Is there a problem there that nobody listens to the jury instructions that are given by the judge so that somebody can intervene and say, wait a minute? Yeah. I don't know the circumstance of that case. All I can speak to is this one. We've laid this out in the brief. We submitted the correct instruction to the court. It looks like it was an error from the court's court. Perhaps it should be a matter of discussion in the office there. It's certainly something that we have, getting into the specifics, we've advised the trial attorneys on. I understood the record. Both counsel submitted a proper instruction and the court changed it. And you'd think that that would be caught when you, you know, resolve at the jury instruction deal. It was somebody needs to tell the district court judge. That's my point. So, right. I mean, I have, I have some, I don't need to get into this guy. I'll just say, go tell the judge. That's that the wrong instruction is being given and it's been known for months. It was a different judge incidentally, and the case argued in January. Right. And what I can assure the court of is, is this is a problem that our office is aware has happened. And we have made a point of, of talking about this with the trial. And I say is to try to make sure that Sarah doesn't, if you made it a point to talk pointed out to the judges. Well, when we submit the instructions, yes, but it's something we'll certainly emphasize more. You've got to be brave sometimes. Counsel. Thank you. Thank you. To address a few points that were brought up on. You better restart the clock. She did dress. Okay. Good stuff in the government's argument. First of all, there was no testimony that Mr. Samaras DNA. He was the major contributor. His was the major profile. It was not, he had the most DNA on there. It was what she could tease out separately. She being the DNA expert. Moreover, it bears noting that the major profile, as is noted on page 177, 78 of the appellate record, it wasn't a complete profile. There was, there were still blanks. Furthermore, related to the date, all of the DNA taken. It was not a whole profile. No, it was not. There were blanks. What does that mean? I don't know what that means. It means she couldn't see all of the stuff that made up that person's DNA. To put it quite simply. But she had enough to identify it as belonging to the defendant. She had enough to make the conclusion that based on the DNA taken directly from the defendant at a time recent to history, she could make that comparison. Okay. That was it. All of the DNA on the gun was taken from the handle. So everybody's DNA that was found on the gun, and there were at least three people, if not more, were taken from the handle. Let me ask you this, Counsel. Because if we, as a court, say, okay, there was an error made in failing to give a proper instruction, and we're reversing on that issue, and we don't go along with the alternative grounds deal, what benefit is it for you when you're arguing the sufficiency of the evidence on the other issue? The benefit would be that if the court finds that the evidence is insufficient to sustain the conviction, Mr. Samora would not be retried. Be what? He would not be retried. That's what I thought was the benefit. Absolutely. But sort of in relation to one of the questions asked to my esteemed counsel, opponent, in terms of affirming for actual possession versus constructive possession, this court noted in a footnote in Simpson that when there's a general verdict and it's not clear upon what theory of the case, the jury decides to preserve the integrity of the judiciary and to preserve the Sixth Amendment jury trial right guarantee, reversal is the appropriate remedy. Is that a harmless error case? No, it was a plain error case, Your Honor. Okay. And you cited that? I did. Okay. Simpson. Simpson. It's footnote 17 in which this court cites United States versus Alexander. The site for which is 817 F third 1205. It's a 2016 case. I'm sorry. What footnote? I believe it's footnote 17 in Simpson. Thank you. And I think I will request that the court respectfully reverse and remand, and I submit the case. Oh, I have a similar line of question about you. Was this case tried from your office? It was, Your Honor. All right. Now I know the January case was not your office. It was CJA council. Okay. Uh, I suggest you have discussions too. That the trial lawyers in your office, uh, check what the final, uh, instructions will be, uh, not just rely upon the stipulated ones. And then they listen closely in the courtroom as those are given. Yes, Your Honor. There are already discussions to that effect. Do you have any explanation of what in the world has gone on? We have two cases now where an element is missing. I'm shocked. And yet we are all human, which is why we get the benefit of this court to correct our human errors. All right. Thank you, Your Honor. All right. Thank you. Uh, all right. Thank you. Council is better. It was well presented both, uh, in your written presentations and orally today, this better will be submitted.